| | | |
|---|---|---|
| **GLORIA LYTLE, LYTLE TRANSPORTATION; ROGER MORRISON; MORRISON & SONS TRANSPORTATION, INC.** | : : : : : | **No. 1:05-CV-0133** |
| **Plaintiffs,** | : : | **JUDGE SYLVIA H. RAMBO** |
| **v.** | : : : | |
| **CAPITAL AREA INTERMEDIATE UNIT**, *et al.*, | : : | |
| **Defendants.** | : | |

## M E M O R A N D U M

Before the court are cross motions for summary judgment (Docs. 64 and 67). By order dated July 14, 2008, the court directed the parties to engage in discovery on the issue of whether Plaintiffs Gloria Lytle and Roger Morrison were employees or independent contractors of Defendant Capital Area Intermediate Unit ("CAIU"). This distinction is essential to the outcome of the case because Plaintiffs' sole federal claim is under the anti-retaliation provision of the False Claims Act, 31 U.S.C. § 3130(h), which allows only employees to bring retaliation claims. If Lytle and Morrison were not employees of the CAIU, then they do not have standing to bring a False Claims Act case. Furthermore, since all of the other claims brought by Plaintiffs are for alleged violations of state law, this court would dismiss those claims for lack of supplemental jurisdiction. The court has reviewed the cross-motions for summary judgments, the response and replies thereto, and for the reasons that follow finds as a matter of law that neither Morrison nor Lytle were employees of the CAIU.

# I.    Background

## A.    Facts

The following facts are undisputed, except where noted.

### 1. Parties

The CAIU is a non-profit organization providing, among other things, educational and transportation services to children who have been identified as requiring special education or early intervention services. (Pls.' Stat. Mat. Facts ¶¶ 7-8.) The CAIU provided this transportation either through employee drivers or through written contracts with transportation contractors such as Lytle and Morrison. (Defs.' Ex. C to Stat. of Mat. Facts, Glenn Zehner Dep. 18.)

Plaintiff Roger Morrison provided transportation services to the CAIU from 1985 though 2000 as a sole proprietor, (Defs.' Ex. A to Stat. of Mat. Facts, Roger Morrison Dep. 25), and from 2000 through 2004 as the owner of Morrison and Sons Transportation Services. (*Id.* at 6-7.) In late 2004, Morrison and Morrison and Sons Transportation filed bankruptcy, went out of business, and ceased providing transportation services for the CAIU. (*Id.* at 27.) After going out of business, Morrison went to work for Gloria Lytle as the business manager for Lytle Transportation, Inc. (Defs.' Ex. B to Stat. of Mat. Facts, Gloria Lytle Dep. 30-31.) Plaintiff Gloria Lytle provided transportation services for the CAIU from 1974 through 1995 as a sole proprietor, (*Id.* 38), and from 1995 though 2006 as the owner of Lytle Transportation, Inc. (*Id.* at 9.) In 2006, Lytle Transportation went out of business. (*Id.* at 27.)

### 2. Contracts

All transportation contractors were required to enter into contacts in order to receive work, perform, or be paid. (*Id.* at 46-47.) Lytle and Morrison were at all times transportation contractors with written contracts to provide

transportation services to the CAIU.  (Defs.' Ex. to Stat. Mat. Facts, Exhibits H through N, Contracts ¶ 20.)

Each of the contracts that Morrison and Lytle executed with the CAIU from 1997 through 2005 were standard contracts for all transportation contractors, and each contained the following language:

> It is understood and agreed to by both parties hereto that the CONTRACTOR, while engaged in carrying out and complying with any of the terms and conditions of this contact, is for all purposes an INDEPENDENT CONTRACTOR and is not and shall not be deemed to be an officer, agent or employe [sic] of the BOARD, and neither party shall contend that CONTRACTOR is an officer, agent or employe [sic] of the BOARD.

(*Id.* at ¶ 20.)

Each year before the contracts with transportation contractors were signed, the CAIU held meetings for the transportation contractors to ask questions about the contract.  (Lytle Dep. 46-48.)   Both Morrison and Lytle read each contract before they signed it, and knew that it contained the above quoted language. (Morrison Dep. 39; Lytle Dep. 46-47).  Neither Lytle nor Morrison had an obligation to sign a particular contract from one year to the next, and they were not guaranteed that they would have a contract from one contract period to the next. (Defs.' Ex. D to Stat. of Mat. Facts, Scott Downey Dep. 94-95.)  Lytle and Morrison were not prohibited from contracting with others for work in addition to the work that they performed for the CAIU, (Morrison Dep. 25-26; Lytle Dep. 11-12, 22-23), and both Morrison and Lytle worked as independent contractors for others during the time in question.  (Morrison Dep. 25-26; Lytle Dep. 11-13.)

### 3.  Vehicles/Transportation of Students

Both Lytle and Morrison owned the vehicles that they used to perform the CAIU contracts.  (Downey Dep. 113.)  However, the CAIU exercised some

control over the type, size, and condition of the vehicles used by Lytle and Morrison. For instance, in the year 2000, in order to continue as a CAIU transportation contractor, all contractors were required to begin purchasing wheelchair accessible vehicles, as well as vehicles that could transport at least nine passengers. (Pls.' Ex. Q in Supp. of Mot. for Sum. J.) By 2004, the CAIU required that all transportation contractors, including Lytle and Morrison, not use vehicles with more than 300,000 miles or older than 10 years for transporting CAIU students, except that such vehicles could be used as a spare. (Defs.' Ex. M to Stat. of Mat. Facts, Contract for 2004-2006 at ¶ 5.)

The CAIU required each vehicle owned by a transportation contractor to have a "vehicle number" that was provided by the CAIU. (Lytle Dep. 102.) This requirement was part of a state mandate. (Downey Dep. 63.) However, both Lytle's and Morrison's vehicles were visibly marked on the exterior with the names of their respective companies. (Lytle Dep. 34; Morrison Dep. 33.) All transportation contractors were required to provide for their own vehicle maintenance, as well as provide the CAIU with proof of liability insurance. (Morrison Dep. 32.) The CAIU carried insurance, including workers compensation, automobile, and excess liability/umbrella insurance to cover all CAIU employee transportation drivers. (Defs. Ex. F to Stat. of Mat. Facts, Shawn Farr Aff. ¶ 3.) The parties dispute whether the general liability, automobile, and workers' compensation insurances also covered Plaintiffs[1] (*Id.*; Doc. 100-2, Certificate of Insurance.) Each vehicle

---

[1] The parties' dispute centers on the interpretation of an insurance certificate from Enders Insurance, as well as the deposition testimony of George Zimmerman, the comptroller/business manager at the CAIU from 1972 through 2003. This certificate is document 100-2 on the docket. Plaintiffs point to the following from Mr. Zimmerman's deposition where he was responding to questions from Plaintiffs' counsel:

Q:      Did the Intermediate Unit, during the time that you were there, carry any

(continued...)

4

driven by transportation contractors was required by the CAIU and the state to have fire extinguishers, first aid kits, flares or reflectors, body fluid kits, and a seat belt cutter, and after 2000, a school student sign. (Downey Dep. 33-34.) These items were available for purchase through the CAIU, but Lytle and Morrison were not required to purchase them through the CAIU. (*Id.*) The CAIU required transportation contractors to use children's car seats and children's harnesses owned by the CAIU. (*Id.* at 35.)

---

[1](...continued)
kind of umbrella insurance?
**A:** **As I recall, yes.**
Q: And did that umbrella insurance provide any insurance over the transportation contractors?
**A:** **To the best of my ability to recall, it did.**
Q: Do you recall what type of insurance it provided over the transportation contractors?
**A:** **It would have been liability insurance, as I recall.**

(Doc. 86-2, Zimmerman Dep. 42:21-43:7 (emphasis in original).)

Later in the same deposition, in response to questions from Defendants' attorney, Mr. Zimmerman testified as follows:

Q: And are you also certain that umbrella insurance was provided for all the transportation contractors?
**A:** **I'm not certain. I'd have to look at the insurance.**
Q: Okay. But you don't know, as we sit here today, you don't know whether the transportation –
**A:** **No, I don't recall that. That's a lot of years ago.**
Q: Well, let me finish. Let me finish, though, okay? As we sit here today, you don't know if the transportation contractors were included in the IU's umbrella insurance policy?
**A:** **If you ask me if I know, the answer is no, I don't know.**
Q: Okay.
**A:** **As I sit here today.**

(*Id.* at 76:8-25 (emphasis in original).)

Mr. Zimmerman's testimony is ambiguous about the extent of coverage under the CAIU's general liability insurance, but is silent as to the other two coverages. The court will discuss the parties' disagreement concerning the scope of coverage of these insurances in Part III.C.3, below.

The CAIU, in the 1990s, provided two-way radios to the transportation contractors for use in their vehicles without cost. (*Id.* at 34.) In addition, the CAIU required bus drivers to wear name tags with the CAIU logo on them; some of the name tags also contained the names of the transportation contractor if the driver worked for a contractor. (Pls.' Ex. V to Stat. of Mat. Facts.) Beginning in 2005, the CAIU formalized a dress code for transportation contractors and their drivers. (Downey Dep. 76; Pls.' Ex. Y to Stat. of Mat. Facts.)

### 4. <u>Scheduling and Servicing of Routes</u>

The parties dispute whether the CAIU scheduled the routes to be driven by the transportation contractors or whether the contractors themselves did so. However, it is undisputed that the CAIU received a list of students from each of the school districts that it contracted with, and that both the CAIU and the transportation contractors had some role in determining the timing and running of the routes. (Defs.' Ex. G to Stat. of Mat. Facts, Deanna Rose Dep. 62-63; Downey Dep. 40-41.) Transportation drivers always had the right to reject a route; of course, this also meant that they would not get paid for it. (Lytle Dep. 49; Farr Aff. ¶ 6.) It is also undisputed that CAIU employee drivers were not given any say in which routes they drove. (Farr Aff. ¶ 6.) Lytle and Morrison had the right to choose which of their drivers would drive a particular route that was assigned to the transportation contractor, and they could substitute drivers at their discretion. (Morrison Dep. 22-23; 28-29.) Once a route was established, Lytle and Morrison could not deviate from the route even if a child was absent. (Lytle Dep. 115; Downey Dep. 48.) If a route was serviced by a CAIU employee driver, and the vehicle servicing that route broke down, one of the transportation drivers would be asked to cover the route, but none of the transportation contractors was obligated to cover the route. (Downey Dep. 126, 133.)

The CAIU distributed new work by use of a seniority list. (Downey Dep. 50-53.) This list was used in order to ensure that new work obtained by the CAIU was distributed fairly. (*Id*.) The seniority list was created, in part, based on the suggestion of Gloria Lytle. (Morrison Dep. 83.) Morrison objected to the use of the list because it did not take into consideration the size and scope of his business, and seemed to him that it was inconsistent with his being an independent contractor. (*Id.* at 83-85.)

### 5. <u>Ability to control their own businesses</u>

Both Lytle and Morrison exercised substantial control over the way that their businesses—Lytle Transportation, Inc. and Morrison & Sons Transportation, Inc.—were run. Nothing in the contract with the CAIU prevented the transportation contractors from contracting with others or directly competing for work with the CAIU. (Downey Dep. 69.) In fact, both Morrison and Lytle provided transportation services to other entities, although their main revenue was from their work with the CAIU. (Lytle Dep. 11-12; Morrison Dep. 30.) The arrangements with these other entities were not as formal as with the CAIU.

Neither Lytle nor Morrison served primarily as drivers for the CAIU. Instead, both had employees who drove for them under the CAIU contracts. At the time that Morrison went out of business, he had at least 42 employee drivers who worked for him. (Morrison Dep. 27.) During the height of her business, Lytle had 17 employees working for her. (Defs.' Ex. O to Stat. of Mat. Facts, Tr. of Proceedings, at 9 (Aug. 15, 2005).) Lytle and Morrison had the right to hire their own drivers, but those drivers had to be approved by the CAIU before they could begin work under the CAIU contracts. (Lytle Dep. 16; Morrison Dep. 44.) The CAIU did not participate in the search process for any of Lytle's or Morrison's employees, and played no role in setting the terms of employment for those drivers.

(Morrison Dep. 44; Lytle Dep. 62-63.) The CAIU had the right to refuse to permit a driver to be used on a CAIU run. (Rose Dep. 73-74; Downey Dep. 27-28.)

The CAIU held mandatory meetings for transportation contractors, but they were limited to driver safety concerns or, in certain circumstances, to reviewing the proposed contracts between the CAIU and the transportation contractors. (Downey Dep. 22.) Lytle viewed these meetings as training, and did not conduct other training for her drivers; however, Morrison chose to train his own drivers on certain aspects of the job like wheelchair transportation. (Morrison Dep. 72-73.)

In certain ways, the CAIU treated its employees drivers similar to the transportation contractors. For instance, the CAIU required both its employee drivers and the transportation contractors' drivers to follow manuals[2] that outlined the safe treatment of children; however, these manuals contained different job descriptions of CAIU employee drivers and contract drivers. (Defs.' Exs. Y & Z to Stat. of Mat. Facts.) Additionally, for a period of time, the CAIU offered transportation contractors an opportunity to purchase gasoline for their vehicles through the CAIU, an opportunity that had previously only been available to CAIU owned vehicles. (Morrison Dep. 87-89). The benefit of this was that transportation contractors were able to purchase gasoline without paying the taxes on the gas, since the CAIU, as a school program, was permitted to purchase gasoline tax free. (Pls.' Ex. CC to Stat. of Mat. Facts.)

### 6. Method of Payment and Tax Treatment

Lytle and Morrison's companies were paid every two weeks based upon a formula developed by the Pennsylvania Department of Education. (Rose Dep. 56-58; Morrison Dep. 37.) Morrison and Lytle paid their drivers directly, and

---

[2]These manual are titled "Guidelines for Transporting Exceptional Children" (Defs.' Ex. Y) and "Handbook for Drivers Transporting Exceptional Children." (Defs. Ex. Z.)

none were paid by the CAIU.  (Morrison Dep. 37.)  Morrison and Lytle withheld taxes for each of their drivers.  (*Id.*)  Moreover, the CAIU did not pay payroll or Social Security taxes for the transportation contractors, including Lytle and Morrison.  (Downey Dep. 87-89.)  The CAIU did not issue W-2s to Lytle or Morrison, or any of their drivers; instead, transportation contractors received 1099s, unless they were incorporated, in which case they did not receive any tax statements from the CAIU.  (*Id.*; Morrison Dep. 31.)  Lytle, Morrison and their drivers did not receive health insurance, retirement benefits, unemployment insurance, workers compensation insurance, sick, or vacation time from the CAIU.  (Morrison Dep. 37-38.)  By contrast, all of the employee drivers of the CAIU did receive these benefits, and all of these drivers had Social Security and payroll taxes withheld from their pay.  (Downey Dep. 72, 87-89.)

### B.   Procedural History

On July 14, 2008, the court issued an order staying disposition of two motions to dismiss Plaintiffs' Amended Complaint, (Docs. 40, 42), and ordered the parties to engage in discovery limited to whether Plaintiffs Lytle and Morrison were employees or independent contractors of the CAIU.  On October 22, 2009, after conducting discovery, both parties filed motions for summary judgment.  (Docs. 64, 67.)  Those motions were fully briefed, and are now ripe for disposition.

## II.   Legal Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231–32 (3d Cir. 2001).  A factual dispute is "material"

if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. *Id.* at 248. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322–23. "'Such affirmative evidence—regardless of whether it is direct or circumstantial—must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.'" *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

## III. __Discussion__

At issue between the parties is whether Plaintiffs Lytle and Morrison were employees for purposes of the False Claims Act, 31 U.S.C. § 3730(h), or independent contractors. The statute provides in relevant part:

> [a]ny *employee* who is discharged, demoted, suspended, threatened, harassed, or in any manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under [the FCA] . . . shall be entitled to all relief necessary to make the employee whole.

31 U.S.C. § 3730(h) (emphasis added). While the plain language of the False Claims Act provides relief for employees only, not independent contractors, the statute does not define the term employee. *Vessell v. DPS Assocs. of Charleston, Inc.*, 148 F.3d 407, 413 (4th Cir. 1998); *see also Watson v. Conn. Gen. Life Ins. Co.*, 87 Fed. App'x 257, 261 (3d Cir. 2004).

When Congress does not define the term employee, courts assume that "Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322–23 (1992) (decided under ERISA); *Vessell*, 148 F.3d at 411–412 (following *Darden* to apply common-law agency definition of "employee" to the FCA); *see also Watson*, 87 Fed. App'x at 262–263 (same); *Shapiro v. Sutherland*, 835 F. Supp. 836, 837 (E.D. Pa. 1993); *Hardin v. DuPont Scandinavia*, 731 F. Supp. 1202, 1205 (S.D.N.Y. 1990).

A determination that a party is either an employee or an independent contractor is a judicial one. *Sampson v. Harvey's Lake Borough*, 881 F. Supp. 138, 143 (M.D. Pa 1995) (citing *Donovan v. Dialamerica Marketing, Inc.,* 727 F.2d 1376 (3d. Cir.), *cert. denied,* 474 U.S. 919 (1985). In making this determination, the court is guided by the factors that the Supreme Court laid out in *Darden*: (1) the extent of the hiring party's right to control the manner and means by which the hired party performs the job; (2) the skills required for the job; (3) the source of the instrumentalities and tools needed to perform the job; (4) the location of the work; (5) the duration of the relationship between the parties; (6) whether the hiring party

has the right to assign additional projects to the hired party; (7) the extent of the hired party's discretion over when and how long to work; (8) the method of payment; (9) the hired party's role in hiring and paying assistants; (10) whether the work is part of the regular business of the hiring party; (11) whether the hiring party is in business; (12) whether the hiring party provides employee benefits; and (13) the tax treatment of the hired party. *Darden*, 503 U.S. at 323–24 (quoting *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751–52 (1989); Restatement (Second) of Agency § 220(2) (1958)). None of these factors alone is dispositive, instead the court must carefully weigh "all the incidents of the relationship." *Id*. at 324. Furthermore since these factors often overlap, and facts that support one often support another, the court will not address them *ad seriatim*, but instead will address them collectively. Before the court engages this analysis, however, the court finds it necessary to look at the terms of the written agreement between the parties and the parties' admissions.

### A.    The Contract and the Parties' Admissions

Each year, Lytle and Morrison executed contracts to provide transportation services to the CAIU. In the early years, these contracts were between Lytle and Morrison as individuals/sole proprietors and the CAIU, whereas in the later years the contracts were between Lytle's and Morrison's corporate entities and the CAIU. Regardless of Plaintiffs' business status, each contract read similarly. Significantly, each contract signed by Lytle and Morrison contained the following clause or something substantially similar:

> It is understood and agreed to by both parties hereto that . . . [Plaintiffs], while engaged in carrying out and complying with any of the terms and conditions of this contract, [are] for all purposes an INDEPENDENT CONTRACTOR and [are] not and shall not be deemed to be an officer, agent or employee of [Defendant CAIU], and neither party shall

12

contend that [Plaintiffs][are] an officer, agent or employee
of [Defendant CAIU].

(Defs.' Ex. H. to Stat. of Mat. Facts ¶ 20.)

The CAIU provided Plaintiffs an opportunity to review the contract terms prior to signing and to inquire about the terms and provisions contained in the contracts. (Lytle Dep. 42-44; Morrison Dep. 39-40.) Lytle and Morrison also both admitted that they knew and understood that they were being classified as independent contractors. (Lytle Dep. 42-44; Morrison Dep. 39-40.) However, both Morrison and Lytle testified at their depositions that transportation contractors lacked negotiation rights, and had to sign contracts regardless of whether they agreed with the terms because if they did not sign them they would lose the contact. Plaintiffs correctly point out that the titles used by the parties are not dispositive; nonetheless, the court cannot simply ignore the labels that the parties have chosen. Thus, the plain language of the contract between the CAIU and Plaintiffs mitigates heavily in favor of finding that Morrison and Lytle were independent contractors not employees.

Morrison's and Lytle's admissions also weigh heavily on the side of them being independent contractors. In this case, as well as in other sworn statements, Morrison has repeatedly aasserted that he was an independent contractor, not an employee. In his deposition, when questioned about the seniority list implemented by the CAIU, Morrison had this to say:

> Q:   How did you feel about the seniority list when it
>       came into existence?
> **A:   I didn't like it at all.**
> Q:   And why was that?
> **A:   Because we're not employees.  At the time, I thought, we're
>       not – at the time I had a discussion with Dr. Bauer.  I said, a
>       seniority list? We're not employees.  This is no union.  What
>       are you talking about, a seniority list?  I didn't like the idea
>       at all.**

> Q:    And why didn't you like the idea? I know you didn't like it, but why didn't you like the idea?
>
> **A:    Well, I was supposed to be an independent contractor. I thought I ran my own business, built my own little operation. By going on a seniority list, I had limitations.**

(Morrison Dep. 83:25-84:15 (emphasis in original).)

In other litigation, Morrison testified that he and Lytle were an independent contractor not CAIU employees. In August 2005, Morrison gave testimony in the Cumberland County Court of Common Pleas in an action brought by him and Lytle Transportation against various school districts. At the time, he was working for Lytle Transportation, Inc. as the business manager, and was authorized to speak on behalf of Lytle Transportation, Inc. (Defs.' Ex. O, Tr. of Proceedings 6:10, 25.) In his testimony, Morrison stated that Lytle Transportation was "listed as a subcontractor" for the CAIU. (*Id.* 10.) He further testified that prior to being employed with Lytle Transportation that he too was a subcontractor with the CAIU. (*Id.* 23.)

On at least three occasions, Morrison made this same representation in actions before this court where he was defendant in a suit brought by another contractor. In *Beam v. Bauer,* No:1:CV-02-1797, Plaintiff Beverly Beam filed an action alleging that Morrison and others violated her constitutional rights while conspiring with the CAIU. In that case, Morrison, through his attorneys, filed a motion to dismiss wherein he represented that he was an independent contractor. Morrison's brief stated at least three times that he was an independent contractor with the CAIU. (*Beam v. Bauer*, 1:CV-02-1797, Doc. 22, at 1, 7-8.) In that case, the court granted Defendant Morrison's motion to dismiss Beam's complaint on grounds of *res judicata* because the matters had previously been litigated before Judge McClure in another matter: *Beam v. Downey*, No. 1:CV-01-0083. In that case, Judge McClure granted Morrison's motion to dismiss Ms. Beam's complaint

because, among other reasons, Morrison was not acting on behalf of the CAIU, and, therefore, was not a state official for purposes of § 1983, but rather that Morrison was an "independent transportation contractor[] for the CAIU." See *Beam v. Downey*, No. 1:CV-01-0083, slip op. at 9, (M.D. Pa. Apr. 10, 2002) (McClure, J.). Finally, in *Boyanowski v. CAIU*, No. 1:CV-94-1252, in support of a motion for summary judgment against a claim brought by Donald Boyanowski, Morrison stated that "Defendant Roger Morrison . . . is an independent contractor who has been transporting special needs students for the CAIU. . . ." (*Id.*, Doc. 45 ¶ 5.)

Each of Morrison's admissions comes in the context of litigation where his interests were aligned with the CAIU. In those cases, Morrison readily asserted that he was an independent contractor. Here, when his interests are not aligned with the CAIU, Morrison asserts that he was an employee of the CAIU, and not an independent contractor. The court finds Morrison's claims in this litigation to be motivated by his desired outcome of the case rather than rooted in fact; the court is unmoved by Morrison's apparent attempt at alchemy, and his suggestion that the facts are now somehow different. While Lytle's admissions are not quite as damning as Morrison's, she nonetheless testified on several occasions that she was an independent contractor rather than an employee. (Lytle Dep. 50-52.)

The court finds that the clarity of the contracts between the parties, as well as Morrison's and Lytle's admissions before this court and others that they were independent contractors and not employees of the CAIU, to be highly persuasive. This is particularly true given that both Morrison and Lytle are sophisticated business persons who have a combined 50 plus years in the transportation business. Given the undisputed facts before the court, including the unambiguous contract provision referenced above and the parties' admissions, it would strain credulity for the court to find that Lytle and Morrison were employees

15

of the CAIU. This becomes abundantly clearer upon examination of the *Darden* factors to which the court will now turn.

### B. The *Darden* Factors

In assessing the *Darden* factors, the court is to look at all aspects of the relationship between the parties, beginning with the actual job being performed. Here, it is undisputed that Plaintiffs' job was the transportation of special needs students to and from school. At its most basic, this involves driving a vehicle. However, the scheduling of routes, the timing of pickup and drop off, the type, age and condition of vehicle, the hiring and firing of drivers, the purchasing of equipment, the substitution of drivers, the training of drivers, and the assignment of additional routes all go to which party controlled *how* the transportation of students occurred. One would expect that if Morrison and Lytle were employees of the CAIU that the CAIU would direct each of these very specifically. In fact, Plaintiffs have argued as much in their briefs. The facts, however, do not support Plaintiffs' conclusion.

The undisputed facts demonstrate that Morrison and Lytle controlled the scheduling and timing of their routes, and the contacts with parents (Morrison Dep. 22-24; Defs.' Ex. G, Rose Dep. 62-3.) Moreover, Morrison and Lytle could reject routes if they were unprofitable. Furthermore, both Lytle and Morrison admit that they owned their vehicles, provided spare vehicles if a vehicle broke down, paid the drivers, and maintained liability insurance as well as unemployment and worker's compensation insurance. (Downey Dep. 113.) This all weighs heavily towards a finding that Plaintiffs were independent contractors, not employees.

Additionally, Lytle and Morrison exercised fundamental control over operating procedures such as the manner and means that they performed their work, the skills required, the location of work, the assignment of work, hiring, and

16

payment of salary and benefits.  Morrison testified that he "worked independently from the administration at the CAIU" and selected drivers and assigned particular routes, substituted drivers, made decisions regarding routes to "maximize [his] profits and minimize his costs," and retained the power to decline particular routes. (Morrison Dep. 28-29.)  When designing routes, Plaintiffs worked directly with the CAIU, school districts, and parents.  (Morrison Dep. 62.)  Morrison and Lytle had the sole authority to hire and fire their employees, determined their employees' wages or salaries, established their employees hours and schedules, and provided their employees training.  (Morrison Dep. 65-66; Lytle Dep. 47-48.)  This all weighs heavily towards a finding that Plaintiffs were independent contractors, not employees.

In response, Plaintiffs contend that CAIU exerted control over their vehicles.  For example, the CAIU required that transportation contractors use vehicles of a particular nature and notify the CAIU prior to purchasing vehicles. (Downey Dep. 113-14.)  Plaintiffs also point to a CAIU policy implemented in 2004 that prohibited transportation contractors from transporting vehicles with more than 300,000 miles or with more than ten years of age, even though Pennsylvania Department of Education and other state laws were less stringent.  (*Id.* at 125.) Similar policies dictated restrictions on car seat use, required use of CAIU issued radios, mandated display of a CAIU identification number and use of CAIU name badges by drivers, as well as completion of mandatory "performance" forms.  (*Id.* at 18–20.)  These facts suggest that the CAIU maintained an element of control over its transportation contractors.  However, on the whole, this control was reasonably related to safety concerns, and was neither overly restrictive of Plaintiffs' running of their businesses nor overly prescriptive such that it would outweigh all of the other

indicia pointing toward Plaintiffs being independent contractors rather than employees.

Lytle and Morrison also argue that the longstanding relationship between the parties mitigates in favor of a finding that Lytle and Morrison were employees. The court disagrees. It is undisputed the both Lytle and Morrison transported students for the CAIU over many years. However, every year that they transported students they signed a contract stating that they were independent contractors not employees. Moreover, the duration of the relationship alone is not dispositive, and the cumulative effect of years of being an independent contractor does not transform one into an employee. The court is also not persuaded that the CAIU's use of a "seniority list" compels the court to find that Plaintiffs were employees. While this fact certainly mitigates in favor of Plaintiffs, it insufficient evidence, even when measured with the other elements of the CAIU's control over Lytle and Morrison, to swing the balance in their favor.

Lytle and Morrison point to other indicia of control to support their contention that they were employees rather than independent contractors; however, none of these is persuasive even considering them in their totality. For example, the court does not believe that CAIU's requirement that it approve drivers hired by Lytle and Morrison tips the scale all that much. The approval process largely involved assuring that drivers satisfied Pennsylvania Department of Education requirements and guaranteeing that drivers did not pose a threat to the safety of students. (Downey Dep. 47-48.) Nor does the use of a CAIU handbook, a very simple dress code for drivers, and CAIU name badges for driver "show total control exerted by" CAIU. (Doc. 74 at 28.) The court takes notice of the CAIU's responsibility of caring for young children, and finds that these requirements do not suggest "total control," but an attempt by the CAIU to embrace this responsibility.

Moreover, the fact that Lytle and Morrison had to attend some meetings sponsored by the CAIU, and that they could have been, but were not, disciplined had they failed to attend those meetings does not mean that they were employees nor does it outweigh all of the other evidence suggesting that Lytle and Morrison were independent contractors.

Lytle's and Morrison's treatment of their own employees and Lytle's and Morrison's tax status further supports a finding in favor of the CAIU. First, the court notes that at the height of their operations Morrison employed at least 42 people and Lytle employed 17 people. (Morrison Dep. 27; Defs.' Ex. Q to Stat. of Mat. Facts, Tr. of Proceedings, at 9.) Lytle and Morrison paid their employees directly every two weeks, withheld taxes for each employee, and issued W-2s at the end of each year. Lytle and Morrison carried workers compensation and unemployment insurance for their employees. All of this is in contrast with how Lytle and Morrison were compensated by the CAIU. The CAIU did not withhold any taxes for income, payroll, or social security from the payments to Lytle and Morrison. Lytle and Morrison received payments by check from CAIU and 1099 tax forms. Neither Lytle, Morrison, or their employees received W-2 forms from the CAIU nor did Plaintiffs or their employees receive health insurance, sick time, personal days, or retirement benefits from CAIU. (*Id.* at 23.) All of this suggests that while Lytle and Morrison treated their drivers as employees, the CAIU treated Lytle and Morrison as independent contractors.

Viewed as a whole, the *Darden* factors mitigate heavily in favor of a finding that Lytle and Morrison were independent contractors of the CAIU. There is no doubt that the CAIU exerted *some* control over the way that Morrison and Lytle provided transportation services to CAIU students. However, these few factors are insufficient to create a factual dispute when considered in light of the weight of the

other *Darden* factors, all of which support the conclusion that Morrison and Lytle were independent contractors.  This is particularly true in light of Morrison's and Lytle's admissions and that plain language of the contract.  All three lead to the inescapable conclusion that  Plaintiffs were not employees of the CAIU.

### C.    IRS Guidelines; Shippensburg School District Contract; and CAIU insurance

Plaintiffs argue that the court should not look exclusively at the *Darden* factors, but also consider other evidence that they are employees rather than independent contractors.  In fact, Plaintiffs spent the bulk of their briefs discussing three other areas that they believe demonstrate that they were employees rather than independent contractors: (1) IRS Guidelines; (2) a contract between the CAIU and the Shippensburg School District; and (3) the CAIU's insurance certificate from Enders Insurance.  The court will discuss each of these in turn.

### 1.  The IRS Guidelines

Plaintiffs contend that the court should look not only to the *Darden* factors but also to the guidance set out in IRS Publication 15A.  Those guidelines set out a framework for determining whether someone is or is not an independent contractor for tax purposes.  The guidelines instruct that one should look at three areas: behavioral control, financial control, and the type of relationship between the parties.  Under behavioral control, the IRS looks at the instructions an employer gives a worker such as whether the business has the "right to direct and control how the workers does the task for which the worker is hired" as well as other factors. (Pls.' Ex. 3 to Br. in Supp. of Pls.' Mot. Sum. J., IRS Publication 15A at 6.)  As to financial control, the IRS looks to whether the worker has unreimbursed expenses; the extent of investment by the worker; the extent to which the worker makes his or her services available to the relevant market; the manner of payment; and the ability

of the worker to make a profit or loss. (*Id.*) Finally, the IRS also looks to the nature of the relationship between the parties such as whether there is a written contract, whether or not the business provides "employee-type benefits," the permanency of the relationship, and the extent to which services performed by the worker are a key aspect of the regular business of the company. (*Id.* at 7.)

The IRS guidelines closely mirror the *Darden* factors and, not surprisingly, when they are applied to the undisputed facts in this case, the result is the same: Plaintiffs are not employees of the CAIU. While the CAIU certainly controlled some of the means by which Lytle's and Morrison's employees performed their jobs, the CAIU in no way controlled Lytle or Morrison's businesses. Lytle and Morrison owned their vans, and they were responsible for maintaining and insuring them. Lytle and Morrison were responsible for their own taxes, for hiring and firing their own drivers, and for paying their drivers. While the CAIU did direct some of Plaintiffs' activities while Plaintiffs were driving for the CAIU, this is to be expected given that the nature of the CAIU's business is transporting children with special needs. It would be incredible if the CAIU had no standards for their drivers to follow, and the fact that both Lytle and Morrison did not have complete freedom to arrange for the transportation of these students does not mean that they were employees of the CAIU. Given the thoroughness of the *Darden* factors, the court does not believe that the IRS guidelines shed any new light onto the relationship between the parties.[3]

---

[3]Plaintiffs spend considerable time in their briefs discussing the fact that a former comptroller of the CAIU, George Zimmerman, attended a seminar in the early 1990s where these IRS guidelines were discussed, and that Mr. Zimmerman believed that the CAIU might have a problem with classifying its transportation contractors as independent contractors rather than employees. The court is unpersuaded by this evidence. First, the determination of whether a party is either an employee or an independent contractor is a judicial one, and, thus, Mr. Zimmerman's opinion that the transportation contractors may be employees is not controlling. *See Donovan v. Dialamercia Marketing, Inc.* 757 F.2d

(continued...)

## 2.  **The Shippensburg School District Contract**

Plaintiffs also argue that the court should find that they are employees of the CAIU because of a contract the CAIU had with the Shippensburg School District.  Specifically, Plaintiffs argue:

> The contract requires the CAIU to use "employees," and prevents the CAIU from subcontracting out the work.  Yet, CAIU admits that they negotiated the contract; that it was reviewed by their solicitor; signed the contract; and performed by "subcontracting" out the work to transportation contractors.  If the CAIU entered this contract, knowing they could not perform without using contractors, then the questions [sic] arises, why did the CAIU agree to this language?  Because the CAIU already knew what this Court will decide: that it treated the transportation contractors as employees.

(Pls.' Br. in Supp. of Mot. for Sum. J. 25.)

Plaintiffs' argument is circular: the court should find that Lytle and Morrison were employees because the CAIU entered into the Shippensburg contract knowing that it contained a provision in it stating that it must use employees to perform the contract, and that the CAIU did so because it knew that the court would find that it treated Plaintiffs as employees.  The court is unconvinced by this reasoning.  First, the Plaintiffs misconstrue the contract.  The contract states, in relevant parts:

> 10.  CONTRACTOR shall employ bus drivers subject to BOARD approval who meet all standards and qualifications of Pennsylvania Bureau of Traffic Safety as well as the policies and procedures of the BOARD concerning application, age, fitness, competence, conduct, licensing and continuing eligibility.  Each driver shall submit to and pass periodic physical examination as

---

[3](...continued)
1376 (3d Cir.), *cert. denied,* 474 U.S. 919 (1985).  Second, it is clear from the record that Mr. Zimmerman could not recall with any specificity what it was that he was concerned about except that the CAIU might have been exercising too much control over the transportation contractors.  The court has addressed the level of the CAIU's control in Part III.B, above, and will not rehash those issues in this context.

> required by the Pennsylvania Department of
> Transportation and the Pennsylvania School Code.

(Ex. M to Pls.' to Stat. of Mat. Facts, Shippensburg contract, ¶¶10, 26.)  Nothing in the Shippensburg contract forbids the CAIU from using independent contractors to perform transportation services.  Plaintiffs cite to the use of the word "employ" in paragraph 10 quoted above, and argue that this required the CAIU only to use its own employee drivers to fulfill the contract.  The irony of Lytle and Morrison's argument is unmistakable.  They argue that the court should be persuaded that they are employees because a third-party contract says that the CAIU must "employ" bus drivers to fulfill the contract, and that the CAIU contemplated using their services to fulfill the contract.  At the same time, Lytle and Morrison argue that the court should ignore the fact that the contract between Plaintiffs and the CAIU expressly states that they are independent contractors.  Plaintiffs' argument defies logic and lacks a foundation in evidence.  Nothing in the record supports Plaintiff's reading of the Shippensburg contract, and in light of all of the other evidence suggesting that Lytle and Morrison are independent contractors the court will not grasp at this straw.[4]

---

[4]Lytle and Morrison also spent considerable time arguing that they are entitled to an adverse inference that the CAIU entered into contracts with the Steelton-Highspire School District, the Big Springs School District, and that the CAIU submitted a bid to the Cumberland Consortium.  Plaintiffs argue that since CAIU employees stated that the CAIU entered into these contracts, and since they were not produced in discovery despite Plaintiffs' requests for them, the court should infer that they would have, "like the Shippensburg contract of the same time frame, referred to the contractors as employees." (Pls.' Br. in Supp. of Mot. for Sum. J. 26.)  Plaintiffs argument lacks support from the record.  First, Defendants responded to Plaintiffs' discovery requests stating that as to the Big Springs contract and Cumberland Consortium bid, either no such documents existed or they were no longer a part of the CAIU's records.  (*See* Pls.' Ex. N to Stat. of Mat. Facts, October 27, 2008 letter from Dean Piermattei, Esquire to Regina Poserina, Esquire.)  Defendants turned over the Steelton-Highspire bid.  (*Id.*)  Plaintiffs argue that Defendants should have kept these documents.  Plaintiffs have pointed to nothing in the record suggesting that Defendants acted in bad faith.  More importantly, however, the court does not believe that an adverse inference would be probative of any material fact at issue in this case.  The court is dubious that any third party contract would resolve the issue before the court—whether Plaintiffs were employees or independent contractors—and, therefore, the court will not draw any inference from the fact that Defendants did not produce the information requested by Plaintiffs.

### 3. **Insurance Certificate**

On April 28, 2009, the court granted Plaintiffs' motion for leave to file a supplemental memorandum of law and supplemental evidence in support of their motion for summary judgment. The evidence submitted was an insurance certificate from Enders Insurance Associates issued to the CAIU. (Doc. 100-2.) The court also granted Defendants leave to submit an affidavit from Donald Enders, President and CEO of Enders Insurance Agency, in rebuttal to Plaintiffs' interpretation of the insurance certificate. Donald Enders' affidavit was submitted on May 13, 2009. (Doc. 106.) On May 30, 2009, Plaintiffs filed a motion to strike Mr. Enders' affidavit (Doc. 107).[5]

Plaintiffs argue that this insurance certificate is proof that the CAIU carried worker's compensation, general auto, and umbrella liability insurance over the transportation contractors and their drivers, and that this evidence weighs towards a finding that Lytle and Morrison were employees of the CAIU. The court agrees that if the CAIU carried these insurances over Lytle, Morrison and their employees that this would weigh in favor of finding that Plaintiffs were employees, although, as discussed below, these facts are not dispositive.

The court has read the insurance document, and it is clear from the face of that document that: (1) the CAIU has insurances from three different companies; (2) these companies' policies cover general liability, automobile liability, excess

---

[5]On May 30, 2009, Counsel for Plaintiffs filed a Motion to Strike Affidavit of Mr. Enders. (Doc. 107.) Plaintiffs argue that the Donald Enders' affidavit, (Doc. 106), contains misstatements of fact, conclusory allegations, and inadmissible facts in violation of Fed.R.Civ.P. 56(e), and, as such, the court should strike the affidavit. The court will deny Plaintiffs' motion. While it is true that Mr. Enders' affidavit contains conclusory statements and averments which are likely inadmissible under Rule 56(e), it also contains averments which are proper for the court's consideration. The court has not relied on Mr. Enders' affidavit to reach its ultimate conclusions, and, more importantly, as set forth in Part III.C.3, the court finds that the insurance certificate is ambiguous and has resolved any ambiguity in favor of Plaintiffs.

liability, workers' compensation, and legal liability; and (3) the Shippensburg School District is named an additional insured as to the general liability insurance.

As to workers compensation insurance, the court finds that the certificate is unambiguous. The only named insured is the CAIU. The endorsement attached to the policy adds *only* the Shippensburg School District as a named insured only as to the *general liability insurance*. Neither Plaintiffs specifically nor transportation contractors generally are listed on the insurance certificate or the endorsement. Plaintiff can point to no evidence in the record supporting the conclusion that they are covered under the CAIU's workers' compensation insurance, and no reasonable jury could conclude based solely on the insurance certificate that they were, in fact, covered. The other two insurance coverages at issue, however, are ambiguous.[6]

Concerning automobile insurance, it is clear from the insurance certificate that no one but the CAIU is a named insured. However, under the section for automobile liability insurance there are 5 categories of autos that could be insured: (1) any auto; (2) all owned autos; (3) scheduled autos; (4) hired autos; and, (5) non-owned autos. (Doc. 100-2.) The one checked is "any auto." (*Id.*) Defendants, through Donald Enders' affidavit, argue that the certificate of insurance "makes clear that the automobile liability only applies to 'any auto' of the CAIU, the named insured on the Certificate, and not to any other person." (Doc. 106, Donald Enders Aff. ¶ 18.) Plaintiffs argue that the term "any auto" is a catch-all which would encompass all of the other four categories, and that if the CAIU meant only to

---

[6]The Plaintiffs' dispute concerns only workers compensation, automobile liability, and general liability insurance. They do not discuss excess liability or legal liability coverages, and so the court will not address them here. Even if they had, the court would resolve those issues similarly to the workers compensation insurance: it is limited to the CAIU, and nothing in the document itself or the record suggests that Plaintiffs were covered under these policies.

insure its vehicles that it could have selected one of the more specific categories such as all "owned autos" or "scheduled autos." Both parties' reading of the certificate of insurance is plausible, and the court will resolve this ambiguity in favor of Plaintiffs, and analyze Plaintiffs' employment status as if Lytle and Morrison were covered by the automobile liability insurance.

As to general liability insurance, Plaintiffs point to the testimony of George Zimmerman as evidence that they were covered under that policy. Mr. Zimmerman's deposition testimony on this issue was set out at length in footnote 1, above. The court notes that the certificate itself does not appear to suggest or imply coverage for Plaintiffs under the CAIU's general liability policy, and there is a tenuous connection, at best, between Mr. Zimmerman's ambiguous testimony and this policy. Nonetheless, Mr. Zimmerman's testimony creates at least the possibility that coverage exists, and the court will, out of an abundance of caution and solely for the purpose of deciding whether Plaintiffs were employees of the CAIU, analyze the facts as if Lytle and Morrison were covered by the CAIU's general liability insurance policy.[7]

In Part III.A, above, the court found that the plain language of the contracts and Plaintiffs' admissions weighed heavily in favor of a finding that Plaintiffs were independent contractors rather than employees. Furthermore, in analyzing the *Darden* factors in Part III.B, above, the court found that those factors swung in favor of a finding that Plaintiffs were not employees. Even if Plaintiffs were covered under the CAIU's automobile and general liability insurance coverages, this is insufficient to create a factual dispute about Plaintiffs'

---

[7]The court's finding that Plaintiffs may be covered under the CAIU's automobile and general liability insurance policies is limited only to the court's disposition of the parties' summary judgment motion, and is not a finding of coverage for purposes of liability on the part of any of the named insurance companies as a result of any action or inaction of Plaintiffs.

employment status in light of all of the other evidence compelling the conclusion that they were independent contractors not employees. The trifecta of the plain language of the contract between the parties, Plaintiffs' admissions, and the *Darden* factors all compel this conclusion, and the court is not convinced that coverage under these insurance contracts sufficiently outweighs the bulk of the other evidence.

## IV.      <u>Conclusion</u>

After a careful review of the record before it, the court finds as a matter of law that Plaintiffs Gloria Lytle and Roger Morrison were independent contractors of the CAIU. This finding is supported by a plain reading of the various contracts between the parties, Lytle's and Morrison's admissions that they were independent contractors, and the court's application of the *Darden* factors. In reaching this determination, the court resolved any ambiguity about Plaintiffs' status in Plaintiffs' favor. The record simply does not support a finding that Plaintiffs were employees of the CAIU. Since Lytle and Morrison were independent contractors of the CAIU they do not have standing to bring a claim under the False Claims Act, 31 U.S.C. § 3130(h). Accordingly, the court will grant Defendants' motion for summary judgment, (Doc. 64), and will deny Plaintiffs motion for summary judgment (Doc. 67). For the reasons noted in footnote 5, above, the court will also deny Plaintiffs' motion to strike the affidavit of Donald Enders (Doc. 107).

The court's jurisdiction in this case is based solely on Plaintiffs' claims under the False Claims Act. Since the court has determined as a matter of law that Plaintiffs were independent contractors not employees of the CAIU, and that Plaintiffs do not have standing to maintain a claim under 31 U.S.C. § 3730(h), there is no federal subject matter jurisdiction in this case. Under these circumstances, the

court does not have the discretion to retain jurisdiction over Plaintiffs' remaining state law claims. *See e.g., Rifkin v. Bear Stearns & Co.,* 248 F.3d 628, 633 (9th Cir. 2001) (stating that because the plaintiffs lacked standing to bring their federal statutory claim, the district could had no authority to exercise supplemental jurisdiction over the remaining state law claims). Therefore, the court will dismiss Plaintiffs' state claims without prejudice to Plaintiffs to bring these claims in an appropriate state forum.

Also pending before the court are two motions to dismiss (Docs. 40 & 42) brought by various Defendants. Since the court has granted summary judgment to Defendants on Plaintiffs' federal claims and dismissed Plaintiffs' state law claims, the court will deny these motions as moot. The court will issue an order consistent with this memorandum.

s/Sylvia H. Rambo
United States District Judge

Dated: June 11, 2009.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GLORIA LYTLE, LYTLE TRANSPORTATION; ROGER MORRISON; MORRISON & SONS TRANSPORTATION, INC.** | : : : : : | **No. 1:05-CV-0133** |
| **Plaintiffs** | : : | **JUDGE SYLVIA H. RAMBO** |
| **v.** | : : | |
| **CAPITAL AREA INTERMEDIATE UNIT, *et al.*,** | : : : | |
| **Defendants** | : | |

# O R D E R

In accordance with the accompanying memorandum of law, **IT IS HEREBY ORDERED THAT**:

(1) Defendants' motion for summary judgment (Doc. 64) is **GRANTED**;

(2) Plaintiffs' motion for summary judgment (Doc. 67) is **DENIED**;

(3) The clerk of court is directed to grant judgment for Defendants and against Plaintiffs Gloria Lytle and Roger Morrison solely on the issue of whether Plaintiffs Lytle and Morrison were employees or independent contractors of Defendant Capital Area Intermediate Unit. The court finds that Plaintiffs Gloria Lytle and Roger Morrison were independent contractors of Defendant Capital Area Intermediate Unit and, therefore, do not have standing to pursue any claims under the False Claims Act, 31 U.S.C. §3730(h) against the Capital Area Intermediate Unit;

(4) Since no federal subject matter jurisdiction is present, the court will dismiss Plaintiffs' state law claims—Counts III through VIII—without prejudice to Plaintiffs to renew those claims in an appropriate state court proceeding;

(5) The motions to dismiss Plaintiffs' Amended Complaint (Docs. 40 & 42) are denied as **MOOT**;

(6) Plaintiffs' motion to strike the affidavit of Donald Enders (Doc. 107) is **DENIED**, and:

(7) The clerk of court is directed to close this case.

                                          s/Sylvia H. Rambo
                                          United States District Judge

Dated:  June 11, 2009.